[No. C043461. Third Dist. Dec. 16, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS STEVEN AMONSON, Defendant and Appellant.

**COUNSEL**

Barry Melton, Public Defender, and Jessie Morris, Jr., Chief Assistant Public Defender, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Matthew L. Cate and John A. Thawley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RAYE, J.**—Defendant Dennis Steven Amonson drove his car across a double yellow line and collided with an oncoming car, killing its two occupants and injuring himself and his passenger. He was charged with two counts of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)) and one count of causing injury while driving under the influence of drugs (Veh.

Code, § 23153, subd. (a)). Multiple-victim enhancements (Veh. Code, § 23558) and great bodily injury enhancements (Pen. Code, § 12022.7, subd. (a)) were alleged. [1]

Proceedings were suspended and defendant was found not competent to stand trial. (§ 1368.) Following evaluations and a hearing, he was placed at Porterville Developmental Center (Porterville) for 180 days pursuant to sections 1600 and 1601, subdivision (a).

On appeal, defendant contends (1) the statutory scheme for the developmentally disabled does not require a 180-day period of treatment in a locked facility such as Porterville, and (2) if the scheme does require confinement, it is constitutionally unreasonable pursuant to *Jackson v. Indiana* (1972) 406 U.S. 715 [32 L.Ed.2d 435, 92 S.Ct. 1845] (*Jackson*). We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In the fatal collision on April 15, 2001, defendant suffered two broken legs, two crushed feet, five broken ribs, a collapsed lung, and a severe head injury. He was flown to a trauma hospital while unconscious and underwent surgery to repair damage to his face. Defendant tested positive for marijuana and methamphetamine.

A first amended complaint was filed in June 2001. Criminal proceedings were suspended and a psychologist was appointed to evaluate defendant's competency. (§ 1368.) Because of his developmental disability, defendant requested an evaluation by the director of Alta California Regional Center (ACRC), where he was a client. (§ 1369.) The appointment of the psychologist was rescinded and ACRC was appointed to evaluate defendant.

Eugene P. Roeder, Ph.D., performed the evaluation and concluded that defendant "is not competent to stand trial at the present time, and it is not likely that he has the capacity to become trial competent." Dr. Roeder noted that defendant has had "a developmental disability from birth," and the automobile accident "further impaired his cognitive capacity and ability to function independently."

In January 2002 defendant waived a jury trial on the issue of competency and the matter was submitted for a court trial based on Dr. Roeder's report. Criminal proceedings were suspended and defendant was referred to ACRC for a placement report. (§ 1370, subd. (a)(2).) In February 2002 ACRC

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

recommended that defendant be placed at his mother's home for competency training, support, and care. (§ 1370.1, subd. (a)(1)(B)(i).)

The prosecutor petitioned for a hearing on defendant's placement, arguing his "criminal history" raised an issue whether he presents "a danger to the health or safety of others." The trial court granted this request.

In March 2002 ACRC reported that defendant's "criminal history" predated the automobile accident. The accident greatly diminished his intellectual functioning and effectively precluded him from engaging in further "dangerous behavior."

The prosecution requested a second expert opinion on this issue from Sidney Nelson, Ph.D. In November 2002 Dr. Nelson found that before the automobile accident, defendant was mildly retarded; the accident reduced his intellectual abilities to the moderate range of mental retardation. Dr. Nelson agreed that defendant could appropriately be maintained at his mother's home.

In December 2002 the prosecution filed points and authorities arguing that before defendant could be placed in an outpatient setting with his mother, he had to be placed in a state hospital for 180 days. (§§ 1600, 1601.) In January 2003 defendant filed points and authorities claiming the 180-day requirement did not apply.

At the January 24, 2003, placement hearing, the defense submitted on the basis of ACRC's reports from February 2002 and March 2002. However, after the trial court noted that the most recent report was almost a year old, the defense called Laurie Casella, the reports' author, to provide more current information.

Casella testified that when a request for a placement recommendation is received, an ACRC team consisting of a psychologist, a physician, a nurse, a supervisor, and a service coordinator considers a client's psychiatric history, current medical needs, and information from retained experts to determine an appropriate placement.

In this case, all the professionals agreed that defendant would benefit from outpatient treatment and was not a danger to the health and safety of others. The team determined that defendant's intellectual functioning had diminished considerably since the accident due to "extensive injuries, including brain trauma." The team decided the "best and safest place" for defendant was with his mother, because his "needs had drastically changed," in that he "required

more care from his mother than he had in the past," and there was "no danger from him being out in the community."

Casella explained that defendant's needs were not such that he would require a group home or other facility. She classified defendant's placement in his mother's home to be "outpatient" rather than "inpatient" because the home is not a licensed facility. However, ACRC recognizes the mother's home as a "residential facility."

Since the March 2002 report, ACRC had continued to treat defendant. The treatment included random alcohol and drug testing at least once a month; all tests were negative.

The ACRC team considered the report by the prosecution expert, Dr. Nelson. Dr. Nelson recommended that defendant continue treatment with ACRC, and that he remain placed with his mother. Dr. Nelson agreed that defendant was not a danger to the health and safety of others.

Regarding Dr. Nelson's notation in his report that defendant had consumed two beers sometime between April 2001 and November 2002, Casella testified she later advised defendant's mother that he cannot consume any alcohol and that she cannot have alcohol in the home.

Regarding Dr. Nelson's notation that defendant had ridden a bicycle for short distances, Casella explained that his riding is limited because of pain. Casella did not believe defendant could or would drive a car, so long as he was properly supervised. The ACRC team favored placement with defendant's mother, rather than a group home, because he "has the best chances of responding appropriately with somebody he trusts and knows."

At the conclusion of the placement hearing, the trial court ordered defendant confined for 180 days, but the court stayed the order until February 7, 2003, and allowed defendant to remain on bail. ACRC was directed to make a recommendation as to an appropriate locked facility.

On February 7, 2003, the trial court received another ACRC report, recommending against a 180-day placement in a locked facility and in favor of placement in the mother's home. However, since locked placement had been ordered, ACRC recommended placement at Porterville. At a hearing that day, the court again stayed its locked facility placement order.

In late February, the trial court received another ACRC report and a Delta Regional Project report that concurred with the ACRC recommendations. On

February 28, 2003, the court ordered defendant placed at Porterville for 180 days but allowed him to remain on bail until a bed became available.

## DISCUSSION

### I

We first consider defendant's contention that the statutory scheme for the developmentally disabled does not require a minimum period of treatment in a locked facility. The contention has no merit.

Section 1370.1 provides that if the defendant is developmentally disabled and found mentally incompetent, "the trial or judgment shall be suspended until the defendant becomes mentally competent." (§ 1370.1, subd. (a)(1)(B).)[2] In this case, several experts found defendant to be moderately

---

[2] Section 1370.1 provides, in relevant part: "(a)(1) . . . . [¶] (B) If the defendant is found mentally incompetent and is developmentally disabled, the trial or judgment shall be suspended until the defendant becomes mentally competent. [¶] . . . [¶] (E) A defendant charged with a violent felony may not be placed in a facility or delivered to a state hospital, developmental center, or residential facility pursuant to this subdivision unless the facility, state hospital, developmental center, or residential facility has a secured perimeter or a locked and controlled treatment facility, and the judge determines that the public safety will be protected. [¶] (F) For purposes of this paragraph, 'violent felony' means an offense specified in subdivision (c) of Section 667.5. [¶] (G) A defendant charged with a violent felony may be placed on outpatient status, as specified in Section 1370.4 or 1600, only if the court finds that the placement will not pose a danger to the health or safety of others. [¶] . . . [¶] (b)(1) Within 90 days of admission of a person committed pursuant to subdivision (a), the executive director or designee of the state hospital, developmental center, or other facility to which the defendant is committed or the outpatient supervisor where the defendant is placed on outpatient status shall make a written report to the committing court and the regional center director or a designee concerning the defendant's progress toward becoming mentally competent. If the defendant has not become mentally competent, but the report discloses a substantial likelihood the defendant will become mentally competent within the next 90 days, the court may order that the defendant shall remain in the state hospital, developmental center, or other facility or on outpatient status for that period of time. Within 150 days of an admission made pursuant to subdivision (a) or if the defendant becomes mentally competent, the executive director or designee of the hospital or developmental center or person in charge of the facility or the outpatient supervisor shall report to the court and the regional center director or his or her designee regarding the defendant's progress toward becoming mentally competent. The court shall provide to the prosecutor and defense counsel copies of all reports under this section. If the report indicates that there is no substantial likelihood that the defendant has become mentally competent, the committing court shall order the defendant to be returned to the court for proceedings pursuant to paragraph (2) of subdivision (c). . . . [¶] . . . [¶] (c) . . . [¶] . . . [¶] (2) In the event of dismissal of the criminal charges before the defendant becomes mentally competent, the defendant shall be subject to the applicable provisions of the Lanterman-Petris-Short Act (Part 1 (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code), or to commitment and detention pursuant to a petition filed pursuant to Section 6502 of the Welfare and Institutions Code. If it is found that the person is not subject

mentally retarded with an IQ of about 52. The experts also found him incompetent to stand trial. Thus, criminal proceedings were properly suspended.

Section 1370.1, subdivision (a)(1)(E) provides: "A defendant charged with a violent felony may not be placed in a facility or delivered to a state hospital, developmental center, or residential facility pursuant to this subdivision unless the facility, state hospital, developmental center, or residential facility has a secured perimeter or a locked and controlled treatment facility, and the judge determines that the public safety will be protected."

Section. 1370.1 defines a "violent felony" as an offense listed in section 667.5, subdivision (c). (§ 1370.1, subd. (a)(1)(F).) Among the listed offenses is "[a]ny felony in which the defendant inflicts great bodily injury on any person other than an accomplice . . . ." (§ 667.5, subd. (c)(8).)

Defendant's offenses were violent felonies because the operative complaint alleged that he inflicted great bodily injury upon all three victims. Thus, defendant could not be *placed* in a residential facility (i.e., as an inpatient) unless it had a secured perimeter or a locked and controlled treatment facility, which his mother's residence does not have.

Although defendant could not be placed as an inpatient at his mother's residence, he could reside there as an outpatient once certain conditions were satisfied. Section 1370.1, subdivision (a)(1)(G) provides: "A defendant charged with a violent felony may be placed on outpatient status, *as specified in Section 1370.4 or 1600*, only if the court finds that the placement will not pose a danger to the health or safety of others." (Italics added.) Having found that "there has been a year and a half of no indication he's been a danger or done anything dangerous or injurious to anyone," the trial court was authorized to consider placing defendant on outpatient status at his mother's residence.

Section 1370.4 establishes the conditions in which a trial court may order outpatient treatment.[3] The statute provides in relevant part: "All of the

---

to commitment or detention pursuant to the applicable provision of the Lanterman-Petris-Short Act . . . or to commitment or detention pursuant to a petition filed pursuant to Section 6502 of the Welfare and Institutions Code, the individual shall not be subject to further confinement pursuant to this article and the criminal action remains subject to dismissal pursuant to Section 1385. The court shall notify the regional center director and the executive director of the developmental center of any dismissal."

[3] Section 1370.4 provides: "If, in the evaluation ordered by the court under Section 1370.1, the regional center director, or a designee, is of the opinion that the defendant is not a danger to the health and safety of others while on outpatient treatment and will benefit from such treatment, and has obtained the agreement of the person in charge of a residential facility and

provisions of Title 15 (commencing with Section 1600) of Part 2 shall apply where a defendant is placed on outpatient status under this section . . . ."

Section 1601, subdivision (a) states in relevant part: "In the case of any person charged with and found incompetent on a charge of . . . any felony involving death [or] great bodily injury, . . . outpatient status under this title shall not be available until that person has actually been confined in a state hospital or other facility for 180 days or more after having been committed under the provisions of law specified in Section 1600."

The trial court correctly noted that Penal Code section 1601, subdivision (a) uses the word "shall," a mandatory term. Contrary to defendant's argument, the mandatory nature of this command is not lessened by the statute's reference to commitments under "the provisions of law specified in [Penal Code] Section 1600." Those "provisions" are the statutory schemes for pleas of not guilty by reason of insanity (Pen. Code, § 1026), inquiry into competence to stand trial (Pen. Code, § 1367), and mentally disordered sex offenders (Welf. & Inst. Code, §§ 6316, 6321). None of those provisions creates an exception to the statutory requirement of confinement for 180 days.

Section 1600 provides that "a developmentally disabled person may be placed on outpatient status from that commitment under the provisions of this title as modified by Section 1370.4." Section 1370.4, in turn, makes the following modifications: "the regional center director shall be substituted for the community program director, the Director of Developmental Services for the Director of Mental Health, and a residential facility for a treatment facility for the purposes of this section." (*Ante*, fn. 3.)

Thus, sections 1370.4 and 1601 together provide that "outpatient status . . . shall not be available" for "a developmentally disabled person" "charged with and found incompetent on a charge of" a "felony involving death" until the person "has actually been confined in" a "residential facility" for "180 days." Because defendant was charged with a violent felony, that confinement must be in a residential facility with a "secured perimeter or a locked andcontrolled treatment facility." (§ 1370.1, subd. (a)(1)(E).) Defendant has not yet satisfied this prerequisite to outpatient status because he has not been confined in a residential facility with a secured perimeter or a locked and

of the defendant that the defendant will receive and submit to outpatient treatment and that the person in charge of the facility will designate a person to be the outpatient supervisor of the defendant, the court may order the defendant to undergo outpatient treatment. All of the provisions of Title 15 (commencing with Section 1600) of Part 2 shall apply where a defendant is placed on outpatient status under this section, except that the regional center director shall be substituted for the community program director, the Director of Developmental Services for the Director of Mental Health, and a residential facility for a treatment facility for the purposes of this section."

controlled treatment facility. Although ACRC considers defendant's mother's home to be a "residential facility" for its own purposes, it is not the sort of facility in which defendant must be confined for 180 days *prior to* placement on "outpatient status." The trial court properly determined that the statutory scheme requires a minimum period of confinement at a residential facility with a secured perimeter or a locked and controlled treatment facility. However, for reasons we next explain, that period may be less than 180 days.

## II

Defendant contends the statutorily mandated period of confinement is not constitutional where, as here, the defendant is not dangerous and his competency cannot be restored during the confinement period. We are not persuaded.

Defendant's constitutional contention is based on *Jackson, supra,* 406 U.S. 715, in which the United States Supreme Court "adopted the so-called 'rule of reasonableness' of the lower federal courts [citations], and declared: 'We hold, consequently, that a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than *the reasonable period of time necessary to determine* whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. [Fn. omitted.] Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal. In light of differing state facilities and procedures and a lack of evidence in this record, we do not think it appropriate for us to attempt to prescribe arbitrary time limits.' [Citations.]" (*In re Davis* (1973) 8 Cal.3d 798, 804 [106 Cal.Rptr. 178, 505 P.2d 1018] (*Davis*), italics added.)

In *Davis*, the California Supreme Court adopted *Jackson's* "rule of reasonableness," "in order to comply with the constitutional principles which controlled that case." (*Davis, supra,* 8 Cal.3d at p. 805.)

To bring the incompetency commitment procedure into conformity with the *Jackson-Davis* guidelines, the Legislature amended the relevant provisions of the Penal Code and the Welfare and Institutions Code. (*Hale v. Superior Court* (1975) 15 Cal.3d 221, 225–226 [124 Cal.Rptr. 57, 539 P.2d 817]; *In re*

*Polk* (1999) 71 Cal.App.4th 1230, 1236–1237 [84 Cal.Rptr.2d 389](*Polk*).)
Two of these provisions are especially relevant here.[4]

█ Within 90 days of a commitment, the facility director or a designee must make a written report to the committing court and the regional center concerning the defendant's progress toward becoming mentally competent. (§ 1370.1, subd. (b)(1); cf. § 1370, subd. (b)(1).) If the report discloses *no* "substantial likelihood the defendant will become mentally competent within the next 90 days," and "indicates that there is no substantial likelihood that the defendant has become mentally competent," then the committing court must order the defendant returned to court for civil commitment proceedings. (§ 1370.1, subds. (b)(1), (c)(2); cf. § 1370, subds. (b)(1), (c)(2); see *Polk, supra,* 71 Cal.App.4th at p. 1237.)

Defendant contends he "cannot be restored to competency based upon his mental retardation," which was made more severe by the automobile accident that "decreased his I.Q. from the high 60s to the low 50s." If defendant is correct, the 90-day report will indicate that he has not become competent and is not likely to become competent within the next 90 days. That would trigger a referral for civil commitment proceedings prior to the expiration of the 180-day confinement period that is prerequisite to outpatient treatment.

█ Defendant effectively contends that even a 90-day commitment is too long because various experts have already evaluated his mental condition and all have reached the same conclusion. However, the Legislature, in its considered judgment, has determined that persons accused of violent felonies must undergo an initial period of evaluation in a residential facility with a secured perimeter or a locked and controlled treatment facility. (§ 1370.1, subd. (a)(1)(E).) Although the experts have forecast that defendant's condition will not improve, the Legislature could rationally favor experience over prognostication and require a short period of actual confinement in the controlled environment of a secure facility. Nothing in *Jackson* suggests the Legislature's determination is constitutionally unreasonable.

[4] The relevant post-*Jackson-Davis* amendment is the 1974 amendment of section 1370. (Stats. 1974, ch. 1511, § 6, pp. 3318–3320; *Polk, supra,* 71 Cal.App.4th at p. 1237.) When section 1370.1 was enacted in 1977, it contained provisions analogous to the 1974 amendment of section 1370. (Stats. 1977, ch. 695, § 5, pp. 2245–2248.) Section 1370.1 was amended in 1992 to provide for when "there is no substantial likelihood that the defendant has become mentally competent." (Stats. 1992, ch. 722, § 13, p. 3360, urgency designation, eff. Sept. 15, 1992.)

## DISPOSITION

The judgment is affirmed.

Davis, Acting P. J., and Butz, J., concurred.