895 A.2d 1024

**Robert Lee WALKER**

v.

**STATE of Maryland.**

**No. 44, Sept. Term, 2005.**

Court of Appeals of Maryland.

April 10, 2006.

Julia Doyle Bernhardt, Assistant Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioner.

Shannon E. Avery, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore), on brief, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

Maryland Code, §§ 3–106 and 3–107 of the Criminal Procedure Article (CP) set forth the procedures to be followed when a defendant in a criminal case is found, by reason of mental disorder or retardation, to be incompetent to stand trial. The question presented to us is whether certain of those procedures, relating to the commitment of the defendant to a facility designated by the Department of Health and Mental Hygiene (DHMH) and to dismissal of the pending criminal charges, pass Constitutional muster when DHMH has concluded that the defendant is not likely to achieve competence within a foreseeable time. Under what circumstances in that situation can the State Constitutionally continue to hold the defendant in confinement? At what point must the pending charges be dismissed?

These are important issues that need to be addressed by an appellate court, *see Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), but, because petitioner chose the wrong vehicle for presenting them to an appellate court, we shall be unable to answer them in this appeal. There are proper and effective ways to present the issues, clearly set forth in the very statutes relied upon by petitioner, and for his benefit and for the benefit of any other persons who may be similarly situated, we shall point them out.

## BACKGROUND

On April 7, 2002, Robert Horseman, a police officer in Caroline County, filed a Statement of Charges in the District Court charging petitioner with first and second degree rape, first, second, third, and fourth degree sexual offense, and second degree assault, all allegedly committed against his seven-year-old niece. The Statement of Probable Cause that accompanied the Statement of Charges alleged, in relevant part, that the child's mother, Ms. Green, had come to the police station and reported that her daughter had been sexually assaulted by petitioner, who was the child's uncle—Ms. Green's brother. Ms. Green recited that, while she and the child were visiting her mother, she allowed the child to go upstairs to petitioner's room to listen to music, that about fifteen minutes later she went to check on the child and found her sitting next to petitioner on petitioner's bed. The child was fully clothed; petitioner was wearing only his boxer shorts. When Ms. Green asked what was going on, the child responded that petitioner had stuck his "thing in her." Ms. Green asked her brother whether he had done that, and he responded "yep" and shook his head.

As a result of this revelation, the child was interviewed and examined by a sexual assault nurse examiner. From the interview and the finding of suspected seminal fluid in the child's vagina, the nurse expressed the belief that the child had been sexually assaulted. At some point, the child told Officer Horseman directly that, when she entered the bedroom, petitioner grabbed her, threw her on the bed, removed

her pants, and "stuck his thing in her." Petitioner was arrested and interviewed, and he denied any sexual contact with the child.

Petitioner was brought before a District Court Commissioner in the late evening of April 7. The record is not entirely clear as to what occurred, other than that (1) there is a notation on the Statement of Charges that the Commissioner found probable cause to support charges of second degree rape and second degree assault but no probable cause for any of the other charges,[1] and (2) believing that petitioner was "incompetent" due to "mental disabilities," the Commissioner initially intended to issue a temporary mental health commitment, but for some reason concluded that he was unable to do that and instead committed petitioner to jail in default of a $50,000 bond, subje.. to later bail review. The next morning, petitioner appeared before a District Court judge and was committed to jail without bail but referred for psychiatric evaluation.

That examination occurred on May 1, 2002. The examining physician reported to the court that petitioner required a more comprehensive evaluation at a DHMH facility and that the case was being referred to the Developmental Disabilities Administration (DDA) of DHMH. On June 19, 2002, a DHMH forensic evaluator, under the supervision of a supervising psychologist, reported that petitioner was then incompetent to stand trial, in that "he does not have a factual and rational understanding of the nature and object of the proceedings against him and presently lacks sufficient ability to consult with his attorney with a reasonable degree of rational understanding." The diagnosis was mental retardation, moderate (IQ at 44–52) and attention deficit disorder with hyperactivity.

The evaluator also concluded, with a reasonable degree of psychological certainty, that, because of mental retardation,

---

1. The Commissioner's finding of no probable cause for the first degree rape and first, third, and fourth degree sexual offense charges did not result in a dismissal of those charges. The record indicates that they remain pending.

petitioner would pose a danger to himself or the person or property of others if released from confinement. Although acknowledging that the 25–year–old petitioner had no prior criminal involvement and did not appear to be a pedophile by preference, the evaluator opined that he was "an opportunist who requires adequate monitoring and supervision to maintain his own safety and that of others." Petitioner, he said, was in need "of a structured environment with built in safeguards" and appeared to be "impulsive, preoccupied and extremely inconsistent, if not unpredictable." The recommendation was an inpatient stay in a secure facility "where notions relating to the subject's dangerousness could be refined if not reevaluated and community appropriateness assessed."

CP § 4–103 provides that, if a defendant is charged in the District Court with a felony that is not within the trial jurisdiction of that court, the defendant, upon request made within ten days after initial appearance, is entitled to a preliminary hearing before a judge, to determine whether there is probable cause to believe that the defendant has committed an offense. First and second degree rape and first and second degree sexual offense are felonies that are not within the trial jurisdiction of the District Court. *See* Md. Code, § 4–302(a) of the Cts. & Jud. Proc. Article (CJP). On April 16, defense counsel timely requested a preliminary hearing.

In light of the evaluation report, the court, with petitioner's signed waiver, postponed a scheduled preliminary hearing and, on June 27, 2002, entered an order (1) finding petitioner incompetent to stand trial and, by reason of mental retardation, to be a danger to himself or the person or property of another, and (2) committing petitioner to DHMH "for confinement until such time as the Court is satisfied that the Defendant is no longer incompetent to stand trial or is no longer, by reason of a mental disorder or mental retardation, a danger to self or the person or property of another." Pursuant to that order, petitioner was transferred to Rosewood Center, a facility for mentally retarded persons operated by DDA.

CP § 3–108 requires DHMH to report at least annually to the court a list of persons it is holding under commitment orders and any recommendations it considers appropriate. On November 26, 2002, petitioner was reevaluated by DDA. It reported to the court that petitioner did not understand basic legal concepts or the proceedings against him, that he was not presently competent to stand trial and that "it does not appear that he can acquire competence in the foreseeable future, even if training attempts are made." The report added that, although petitioner had not engaged in dangerous behavior since coming to Rosewood Center, "the possibility remains that he may sexually victimize a young child," and that he must therefore "be considered dangerous to the person and property of another and should not have access to children or other vulnerable people if he returns to the community."

That assessment of dangerousness followed the analysis of the Chief Psychologist, who observed:

"Mr. Walker's dangerousness to others presents a dilemma. He has not shown any evidence that he is dangerous since he has been at Rosewood Center. However, the charges against him involve a young child to whom he had unsupervised access. There is no access to children at Rosewood Center, particularly for someone in a locked residence and a locked work area with 24–hour supervision. If Mr. Walker did what he is charged with doing then he is certainly dangerous to others. If he did not do what is charged, he should not be considered dangerous since he has no other record of dangerous behavior. However, the charges cannot be resolved since Mr. Walker is not competent. Under these circumstances, and given the types of charges, Mr. Walker must still be considered dangerous to the person and property of another. If he were to return to the community, he must never have unsupervised access to children or other vulnerable persons."

Following that report, petitioner, through counsel, asked that the court "enter an order confirming the defendant's incompetency." On March 17, 2003, the court obliged and entered another order finding petitioner incompetent to stand

trial and, by reason of mental retardation, to be a danger to self or the person or property of another, and committing him to DHMH.

In conformance with CP § 3–108, petitioner was reevaluated in November, 2003. DDA reported that he had not made sufficient progress to meet his objective of learning basic legal terms, which would be a first step in demonstrating competence to stand trial, and that he should therefore still be considered not competent. Due to deficiencies in adaptive skills, the report added, "it may be that Mr. Walker will not acquire competence in the foreseeable future, but it is premature to come to that conclusion." His training objective was being continued. As to dangerousness, the report iterated the concern noted a year earlier, that he did not appear dangerous to himself or others but that he had no access to children while at Rosewood Center. The Acting Director at Rosewood and the Director of DDA concluded that petitioner "should never have unsupervised access to children since his alleged offenses took place while he was alone with a child." As before, that conclusion followed the determination by the Chief Psychologist that petitioner "is not dangerous to himself, or others, with the proviso that he may have no unsupervised access to children at any time."

The next annual evaluation occurred November 18, 2004. It was a repeat of the 2003 evaluation. The recommendation of Rosewood and DDA was that petitioner "should still be considered incompetent to stand trial and he is not likely to become competent within the foreseeable future." The report added that, although he did not appear dangerous to himself or others based on his behavior since coming to Rosewood, "he should not be permitted to have unsupervised access to children." As before, that recommendation was based on the conclusion of the Chief Psychologist that petitioner "is not dangerous as long as he has no opportunity for unsupervised access to children."

At no point during this two-and-a-half year period did the State seek an indictment or file a criminal information in order

to bring the case to the Circuit Court. Petitioner remained confined at Rosewood Center pursuant to a Statement of Charges filed by the police in District Court. A District Court commissioner had found no probable cause to support five of the seven charges, including the two flagship felonies, but, due to petitioner's incompetency, the Statement of Charges had never been subjected to a probable cause determination by a judge. In February, 2005, petitioner filed in the District Court a motion to dismiss the criminal charges, contending that, because of his permanent moderate retardation and illiteracy, he would never become competent to stand trial. He averred, presumably on the issue of dangerousness, that he had been allowed home visits at his mother's home and that no problems had been reported. He contended that, as applied to him, CP §§ 3–106 and 3–107 were unconstitutional in that they violated his right to due process of law and equal protection of the laws. It was impermissible, he argued, for the State to keep him confined under a criminal charge when it appeared that he would never be competent to stand trial, and that it should dismiss the criminal charges and seek, if it wishes to continue his confinement, to have him committed under the civil commitment law. The court denied the motion, apparently summarily, and petitioner appealed to the Circuit Court for Caroline County.

On May 3, 2005, while the appeal was pending, the Director of Rosewood Center wrote to the District Court judge that petitioner's treatment team believed that petitioner "would be a good candidate for successful community living with appropriate supervision and supports." The program plan would include training supports and appropriate supervision "required for him to successfully participate in supported employment within a sheltered and structured setting." The letter, accordingly, was to request court approval for community placement prior to June 30, 2005.

On May 4, 2005, the Circuit Court, after a hearing, affirmed the District Court's denial of the motion to dismiss the criminal charges, finding no Constitutional basis to disturb that ruling. The court pointed out that the proper way to raise the

constitutionality of petitioner's continued confinement based on those charges was a petition for release under Maryland Code, § 5–507 of the Health–General Article (HG) but, aware of Rosewood's May 3 letter recommending petitioner's placement in a community setting and in an effort to expedite that relief, remanded the case for the District Court to consider that recommendation, which had not been before it when it ruled on petitioner's motion. The Circuit Court judge, having apparently communicated with the District Court judge, advised that a hearing could be held as early as the following week.

Instead of proceeding in that manner, petitioner, on June 1, 2005, filed a petition for *certiorari* to review the Circuit Court's decision. We granted that petition.[2]

## DISCUSSION

### The Statutory Framework

There is an interplay here between two sets of statutes (CP §§ 3–106 and 3–107 and HG §§ 7–506 and 7–507), complicated to some extent by a third (CJP § 3–701).

CP §§ 3–106 and 3–107 are part of the subtitle of the Criminal Procedure Article dealing with incompetence and criminal responsibility. CP § 3–104 provides that, if a defendant appears to the court to be incompetent to stand trial or the defendant alleges incompetence, the court must determine, upon evidence presented on the record, whether the defendant *is* incompetent. Incompetence to stand trial is defined in CP § 3–101(f) as an inability to understand the nature or object of the proceeding or to assist in one's defense. Section 3–105 permits the court to have the defendant examined and sets forth the procedures for such an examination and a report of

---

2. It appears that, on June 29, 2005, after filing his petition for *certiorari*, petitioner filed a petition for writ of habeas corpus in the Circuit Court for Caroline County, claiming that he was being unlawfully confined. Although, as we shall explain, that would have been an effective alternative means of contesting his continued confinement, he withdrew that petition the next day.

its results. The section requires that, if DHMH opines that the defendant is incompetent to stand trial, it must, in a supplement to its report, state whether, because of mental retardation or mental disorder, the defendant would be a danger to self or to the person or property of another if released.

CP § 3–106 deals generally with what occurs when there is a finding of incompetence. If the court finds that the defendant is *not* dangerous, it may set bail or release the defendant on recognizance. If the court finds that the defendant *is* a danger, it may order that the defendant be committed to a DHMH-designated facility "until the court is satisfied that the defendant no longer is incompetent to stand trial or no longer is, because of mental retardation or a mental disorder, a danger to self or the person or property of others." If the defendant is committed because of mental retardation, as petitioner was, § 3–106(b)(2) requires DDA to provide the care and treatment that the defendant needs.

CP § 3–106(c)(1) provides that, on suggestion of the defendant or on its own initiative, the court may reconsider whether the defendant is incompetent. That would apply whether or not the defendant has been committed and is being confined. Section 3–106(c)(2) adds that, if the defendant has been committed by the court, he or she may apply for release under HG § 7–507 or § 10–805, which are part of the laws governing the civil commitment and confinement of persons suffering from mental retardation (§ 7–507) and mental disorder (§ 10–805). CP § 3–106(d), in addition, permits defense counsel to "make any legal objection to the prosecution that may be determined fairly before trial and without the personal participation of the defendant."

HG § 7–507 permits a person confined in a State mental retardation residential center to file a petition in a Circuit Court for release and, upon request, to have a jury trial.[3] The

---

3. A petition under HG § 7–507 may not be filed in the District Court, presumably because of the right to a jury trial.

issues to be tried are whether the petitioner has a mental retardation, whether, for adequate habilitation, the petitioner needs residential services, and whether there is a less restrictive setting in which the needed services can be provided that is, or within a reasonable time will be, available. Section 7–507(j) provides that, after a determination on the merits of a petition, the court may not hear a later petition within one year unless (1) the petition is verified and alleges an improvement in the individual's condition since the prior determination, and (2) the court determines that the matter should be reopened. HG § 10–805 contains similar provisions with respect to individuals confined because of mental disorder, rather than mental retardation. CP § 3–106(c) makes clear that the frequency limitations expressed in HG §§ 7–507 and 10–805 apply as well to reconsiderations under CP § 3–106. HG § 7–506 provides an alternative to this statutory remedy. It allows any individual who has been admitted to a State residential center to "apply at any time to a court of competent jurisdiction for a writ of habeas corpus to determine the cause and the legality of the detention."

CP § 3–107 deals with the criminal charges. Subsection (a) provides that, whether or not the defendant is confined, if the court finds that resuming the criminal proceeding would be unjust because of the passage of time since the defendant was found incompetent to stand trial, it may dismiss the charge. It may *not* dismiss the charge, however, "until 5 years after the defendant was found incompetent to stand trial in any [non-capital] case where the penalty may be imprisonment in a State correctional facility." Because petitioner would face imprisonment in a State correctional facility if convicted of any of the charges pending against him, the court would be precluded by § 3–107(a) from dismissing those charges, even if it were to find that resuming the prosecution would be unjust, until June, 2007–five years after he was found incompetent.

### *Procedural Issue—Appealability*

Petitioner's motion in the District Court, presumably filed by counsel pursuant to CP § 3–106(d), was captioned as a

Motion to Dismiss Charges. In it, however, his attack was on "[t]he statutory scheme that provides authority for the *commitment* of the defendant," (emphasis added) which he alleged to be unconstitutional in that it denied him due process, equal protection, his right to speedy trial, and his right not to be subjected to cruel and unusual punishment. The relief he sought was for the court "to grant this motion to dismiss or, in the alternative, order a hearing on this motion to dismiss so that this Court may inquire into the legality of the Petitioner's detention and for such other relief as the Court shall deem necessary."

Petitioner's appeal to the Circuit Court was from the denial of that motion. CJP § 12–401 permits a defendant to appeal to the Circuit Court from a final judgment entered by the District Court in a criminal case. There is no authority, however, for an appeal from an interlocutory order entered by the District Court, whether in a civil or criminal case.[4] An *order denying a motion to dismiss pending criminal charges is obviously not a final judgment;* the case remains very much alive in the District Court. Nor may an immediate appeal be taken from such an order under the collateral order doctrine. Petitioner's motion to dismiss the criminal charges was based essentially on speedy trial principles—that it was unlawful to keep the charges pending when he could not effectively be brought to trial on them—and, in *Stewart v. State,* 282 Md. 557, 386 A.2d 1206 (1978), we expressly overruled earlier determinations to the contrary and held that a defendant may not appeal, prior to trial, from an order denying a motion to dismiss an indictment because of an alleged speedy trial violation. *Compare Divver v. State,* 356 Md. 379, 739 A.2d 71 (1999), holding that a District Court's denial of a motion to dismiss criminal charges on speedy trial grounds may be appealed to and reviewed by the Circuit Court after final

---

4. CJP § 12–303 permits an appeal from certain enumerated interlocutory orders entered by a circuit court in a civil case. That section is not applicable to orders entered by the District Court, however, or to orders entered in criminal cases.

judgment has been entered by the District Court.[5] The Circuit Court, determining on the merits that the District Court did not err in refusing to dismiss the Statement of Charges, affirmed that ruling. It should instead have dismissed that aspect of the appeal.

The motion, despite its caption, sought relief other than just dismissal of the Statement of Charges; the thrust of the motion, notwithstanding its caption and articulated prayers for relief, was to seek release from confinement, or at least a hearing on the legality of continued confinement, whether or not the charges were dismissed. Petitioner's quest for release was based, in part, on the assertion that, given DHMH's determination, after nearly three years of confinement, that he was not likely to become competent to stand trial in the foreseeable future, it was legally impermissible for the court to continue his confinement solely on the basis of the pending criminal charges—that if the State believed that confinement was necessary in light of the charges, it was obliged to pursue a civil commitment. *See Jackson, supra,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435. The question arises whether that aspect of the District Court's ruling on the confinement question was immediately appealable and, if so, on what basis.

Clearly, the motion was filed in the criminal case pending in the District Court. It was physically filed with that court, was captioned as being filed in the criminal case pending in that court, and sought an order dismissing criminal charges pend-

---

5. It would appear that the due process, equal protection, and cruel and unusual punishment grounds asserted in petitioner's motion to dismiss went to the validity of his indefinite confinement rather than the continued pendency of the criminal charges, but even if they could be construed as applying to the charges as well, on the theory that the confinement was justified only by the pending charges, it would not make the order denying the motion immediately appealable. In *Parrott v. State,* 301 Md. 411, 426, 483 A.2d 68, 75 (1984), we abandoned the notion that an interlocutory order is immediately appealable simply because it denies an alleged constitutional right, the enforcement of which would effectively preclude trial, or a particular mode of trial, on the criminal charges. *See Old Cedar v. Parker Construction,* 320 Md. 626, 629–33, 579 A.2d 275, 276–79 (1990); *Pittsburgh Corning v. James,* 353 Md. 657, 665–66, 728 A.2d 210, 214 (1999).

**14**

ing in the District Court. It was not filed as a habeas corpus petition.[6] Nor may it be treated as either a petition for

6. Because the motion clearly did not constitute, or purport to be, a petition for habeas corpus, we need not consider whether petitioner could have presented such a petition to a District Court judge. HG § 7–506, as noted, permits an individual admitted to a State residential center to apply "to a court of competent jurisdiction" for a writ of habeas corpus. Habeas corpus is a common law writ that, under English law and practice, some, but not all, courts or judges had the authority to issue. See *Deckard v. State*, 38 Md. 186 (1873); *State v. Glenn*, 54 Md. 572, 595–99 (1880). In Maryland, from a fairly early time, the Legislature has attempted to prescribe which courts or judges could issue the writ. In the 1860 Code, for example, habeas corpus jurisdiction was limited to the judges of the county circuit courts, three of the four Constitutionally-created courts in Baltimore City, and the Court of Appeals, but not the Court of Common Pleas in Baltimore City and not justices of the peace. See Maryland Code (1860), Art. 43, §§ 1 and 2.

By 1966, the statutory authority had been extended to any judge of a circuit court for a county, the Supreme Bench of Baltimore City (which consisted of six Constitutionally or statutorily created courts of general trial jurisdiction for the City), or of the Court of Appeals. When the Court of Special Appeals was created in 1966, the judges of that court were added to the list. See 1966 Md. Laws, ch. 12, § 8. In 1982, when the six Baltimore City courts were consolidated into the Circuit Court for Baltimore City, the reference to the Supreme Bench of Baltimore City was eliminated, the new Circuit Court for Baltimore City being regarded as included within the definition of a circuit court for a county. See 1982 Md. Laws, ch. 820, § 6. The current statute, CJP § 3–701, provides that "[a] judge of the circuit court for a county, of the Court of Special Appeals, or of the Court of Appeals has the power to grant the writ of habeas corpus and exercise jurisdiction in all matters, pertaining to habeas corpus."

Unfortunately, when the District Court was created in 1971, the habeas corpus statute was not amended to include the judges of that court, although the court is a Constitutional court of record, consisting of law-trained judges having the qualifications set forth in Article IV § 2 of the Constitution and appointed by the Governor subject to Senate confirmation. A mere reading of CJP § 3–701 might suggest that District Court judges do not have the authority to issue traditional writs of habeas corpus. That silence needs to be considered in light of Article IV, § 6, and Article III, § 55 of the Maryland Constitution, however. Article IV, § 6, which first came into the Constitution in 1851, provides that "[a]ll Judges shall, by virtue of their offices, be Conservators of the Peace throughout the State ..." Article III, § 55 prohibits the General Assembly from passing any law suspending the privilege of writ of habeas corpus. In *State v. Glenn, supra*, 54 Md. 572, we construed the Article IV provision as being, in Maryland, the source of the power of a judge, as a judge, rather than acting as a court, to issue writs of habeas

release under HG § 7–507 or an action for declaratory judgment that CP §§ 3–106 or 3–107, as applied to petitioner, were invalid, as those kinds of actions must be filed in a circuit court. *See* HG § 7–507(b) (a petition for release shall be filed in a circuit court) and CJP §§ 3–403(a) and 4–402(c) (declaratory judgment action may not be filed in District Court). The order denying relief from continued confinement obviously was not a final order in the pending criminal case and therefore was not appealable as a final judgment.

■ But for the clear availability of at least two other methods of raising the Constitutional issue sought to be presented here—petition for release under HG § 7–507 and CP § 3–106(c)(2) and petition for habeas corpus—an argument might be made that the interlocutory denial by the District Court of relief from confinement was appealable under the collateral order doctrine. This Court has made clear, however, that the collateral order doctrine in Maryland is very limited. In *Pittsburgh Corning v. James,* 353 Md. 657, 660–61, 728 A.2d 210, 211 (1999), we observed:

"We have made clear, time and again, as has the United States Supreme Court, that the collateral order doctrine is a very narrow exception to the general rule that appellate review ordinarily must await the entry of a final judgment disposing of all claims against all parties. It is applicable to a 'small class' of cases in which the interlocutory order sought to be reviewed (1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, *and* (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment."

There are two impediments to applying the collateral order doctrine to the District Court ruling at issue here. First, it is not at all clear that there was a conclusive determination of the question. To the extent that the motion sought release

corpus, and concluded, by virtue of Art. III, § 55, that any attempted restriction on that power by the Legislature was nugatory.

from confinement, it invoked the discretion of the court under CP § 3-106 to reconsider whether petitioner was any longer either incompetent or dangerous and whether, even if so, the State was obliged to seek a civil commitment. When the motion was presented and summarily denied, Rosewood had not yet written its May 3 letter recommending a community placement. The District Court may have reached a different result if asked to reconsider in light of that recommendation. Its denial of the motion, as presented, was not necessarily a conclusive determination of the question.[7]

Given the available statutory alternatives for seeking both release from confinement and dismissal of the criminal charges on the ground that a statutory impediment to such relief was unconstitutional, it also does not appear that the interlocutory order would be effectively unreviewable if not immediately appealable. To the extent that petitioner's quest for both release from confinement and dismissal of the criminal charges hinged on the validity or invalidity of limitations contained in State statutes, that quest could have been effectively presented through a petition for habeas corpus or through a petition for release under HG § 7-507, and upon judgment entered by the court on that issue, presented to an appellate court.

Where clear avenues for effective relief are available, it would be inappropriate to ignore or unduly mangle legislatively imposed jurisdictional limitations to permit an inappropriate procedure to be used.

**JUDGMENT OF CIRCUIT COURT FOR CAROLINE COUNTY VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO DISMISS APPEAL FROM DISTRICT COURT; COSTS TO BE PAID BY PETITIONER.**

---

7. HG § 7-507(j) permits a court to reconsider a petition for release within a year after it has denied such a petition if the petition is verified and alleges an improvement in the petitioner's contention. The May 3 letter from Rosewood indicated such an improvement.