# Third District Court of Appeal

## State of Florida

Opinion filed September 9, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-2060
Lower Tribunal No. 10-7848
_____

**Department of Children and Families,**
Petitioner,

vs.

**The State of Florida and C.Z.,**
Respondents.

A Petition for Writ of Certiorari to the Circuit Court for Miami-Dade County, Ariana Fajardo Orshan, Judge.

Javier A. Ley-Soto, Chief Regional Counsel, and Carlos A. Garcia, Assistant Regional Counsel, for petitioner.

Pamela Jo Bondi, Attorney General, and Michael W. Mervine, Assistant Attorney General; Carlos J. Martinez, Public Defender, and John Eddy Morrison, Assistant Public Defender, for respondents.

Before SUAREZ, C.J., and SHEPHERD and ROTHENBERG, JJ.

SHEPHERD, J.

The Florida Department of Children and Families seeks certiorari relief from a trial court order requiring it to place a chronically homeless, criminal defendant, who is not restorable to competency to stand trial, in a secure, locked facility to prevent him from wandering off and providing for his daily needs. The defendant has been declared ineligible for commitment under the Baker Act, §§ 394.451 et seq., Fla. Stat. (2011), the usual law pursuant to which an individual who is incapable of caring for himself is involuntarily committed for treatment. We grant the petition and quash the order of the lower court. A summary of the defendant's course through the criminal justice system is necessary to explain our decision.[1]

**Facts and Procedural History**

C.Z. is a mentally ill individual who has been cycling through the criminal justice system for more than ten years. The encounter which resulted in this case occurred on March 11, 2010. On that date, City of Miami police arrested C.Z. on a misdemeanor charge of criminal mischief, which escalated into felony charges of resisting arrest and battery on a law enforcement officer. In May 2010, the trial court ordered C.Z. to be evaluated to determine his competency to stand trial. On June 29, 2010, the trial court held an evidentiary hearing, and found him

---

[1] The charges against the defendant have recently been dismissed without prejudice pursuant to section 916.145 of the Florida Statutes (2014). However, we agree with the parties that this is a case that is likely to recur, and accordingly decline to dismiss the case as moot. See Gregory v. Rice, 727 So. 2d 251, 252 (Fla. 1999) (recognizing mootness does not destroy appellate jurisdiction on issues of great public importance or which are likely to recur).

incompetent to stand trial. This in turn led to an order of involuntary commitment to the Department for treatment pursuant to section 916.13, Florida Statutes (2011).

On May 18, 2011, after further psychological testing, the trial court deemed C.Z. non-restorable. This determination meant C.Z. could no longer be held under section 916.13. See Oren v. Judd, 940 So. 2d 1271 (Fla. 2d DCA 2006). Nevertheless, it was plain to all involved – the judge, the prosecutor and defense counsel – that while C.Z. failed to meet the legal requirements necessary to be declared competent to stand trial, he was also not capable of caring for himself. For the most part, the mental health professionals also held the opinion that C.Z. was ineligible for involuntary civil commitment under the Baker Act. See § 394.467, Fla. Stat. (2011). By default, the only option the trial court had available to provide placement for C.Z. was through conditional release, pursuant to section 916.17 of the Florida Statutes and Florida Rules of Criminal Procedures 3.212(d) and 3.219. With the assistance of the State, Office of the Public Defender, and all available mental health professionals and facilities, a succession of judges assigned to this case, including the one who issued the order on appeal, made yeopersons' efforts to lawfully secure C.Z. from self-harm (often traceable to his failure to self-medicate), as well as harm by others, and to protect the community if C.Z. returned to living on the streets. The following is a chronology of those efforts:

- May 17, 2011: The defendant was ordered to reside at The Manor, while receiving services from the Fellowship House Program.

- June 21, 2011: The defendant was arrested for leaving The Manor without permission of the court, a violation of the defendant's conditional plan of release.

- June 23, 2011: Pursuant to a court order, the defendant was evaluated by Dr. Ralph Richardson, who concluded the defendant required a locked-down program with 24-hour supervision due to his mental illness.

- September 1, 2011: The defendant was ordered to reside at Forensic Acute Stabilization and Treatment Program (FASTrack), a short-term, locked facility with 24-hour supervision.

- May 24, 2012: FASTrack advised the defendant had received all of the benefit possible from the FASTrack program, and the defendant was transferred to Passageway Residence of Miami-Dade County.

- July 19, 2012: The defendant resisted his placement at the Passageways Residence, and was removed to Greenview Assisted Living Facility, with day treatment at the Fellowship House.

- January 23, 2013: Following a sexual assault on a staff member, the defendant was transported to Westchester Hospital for psychiatric stabilization. Greenview refused to allow the defendant back into its facility.

- February 13, 2013: The defendant was ordered to reside at New Greenview Assisted Living Facility, a sister facility to Greenview Assisted Living Facility, with day treatment at Fellowship House.

- March 1, 2013: The court issued a warrant for the defendant's arrest for absconding from New Greenview Assisted Living Facility. The warrant was served on March 4, 2013.

4

- <u>March 25, 2013</u>: Again, the court released the defendant back to New Greenview Assisted Living Facility, with day treatment at Fellowship House.

- <u>April 19, 2013</u>: The court issued a second warrant for the defendant's arrest for absconding from New Greenview Assisted Living Facility.

- <u>April 25, 2013</u>: The court authorized a conditional release plan requiring the defendant to reside at Maylu Retirement Home.

- <u>May 8, 2013</u>: The court issued another warrant for the defendant's arrest for absconding from the Maylu Retirement Home.

- <u>May 21, 2013</u>: When the defendant walked into the courthouse in a disheveled, unclean condition, the court took him into custody and ordered him transported to the Miami Behavioral Crisis Stabilization Unit.

- <u>June 7, 2013</u>: The court rejected a proposed conditional release plan to Superior Living of Little Havana and any plan to release the defendant to an assisted living facility, finding the levels of staff supervision and ingress and egress control at an assisted living facility inadequate to ensure proper care for the defendant.

- <u>July 15, 2013</u>: The court ordered the Department to place the defendant in a secure, locked facility, where his daily needs can be provided for and staff can prevent him from wandering off and becoming a danger to himself and others.

With this last order, the two-year cooperative efforts of the State, public defender and trial court to provide mental health assistance to C.Z. dissolved.

With the exception of short-term crisis stabilization, all of C.Z.'s court-ordered placements during the two-year period were to facilities which were lightly staffed and not secured or locked in any conventional sense. Generally, this is the

type of facility to which a defendant is committed under the conditional release statute for longer term residency and outpatient psychiatric services. In contrast, commitment and treatment pursuant to section 916.13 occurs in secured and locked facilities. However, the liberty interests, which lie at the heart of our nation's heritage, preclude the State from holding an individual indefinitely against his will on criminal charges when it is plain that he can never be brought to court to answer for his crimes. See Jackson v. Indiana, 406 U.S. 715, 738 (1972). It is that interest which has arisen from its slumber in this case, and which compels us in the end to quash the order under review.

## Analysis

"Certiorari review is proper when it is alleged that the circuit court's interpretation of a statute violates clearly established law or when it fails to follow the dictates of a statute, and the error is sufficiently egregious as to result in a miscarriage of justice." In re Asbestos Litig., 933 So. 2d 613, 615 (Fla. 3d DCA 2006) (citing Allstate Ins. Co. v. Kaklamanos, 843 So. 2d 885, 889 (Fla. 2003)); see also Ivey v. Allstate Ins. Co., 774 So. 2d 679, 682 (Fla. 2000)). Certiorari jurisdiction lies to rectify a trial court order to the Department to assume treatment responsibilities for an individual beyond what is required by statute. See Dep't of Children & Families v. Carmona, 159 So. 3d 165 (Fla. 2d DCA 2015); Dep't of Children & Family Servs. v. Amaya, 10 So. 3d 152, 154 (Fla. 4th DCA 2009); Fla.

6

Dep't of Children & Families v. Davis, 923 So. 2d 1290 (Fla. 3d DCA 2006).[2]

This is such a case.

We do not underestimate the predicament in which the trial judge found herself in this case. For two years, the court, the State and the Office of the Public Defender had labored to provide assistance to C.Z. As of the time of the hearing in this case, C.Z. could no longer be held under section 916.13, and he was ineligible for involuntary commitment under the Baker Act. C.Z. had been placed in and walked out of various residential treatment facilities, with interim periods in stabilization facilities. As the Department's diversion specialist opined, "I don't think there's anything that's offered in the community right now that he hasn't been to or has been to." C.Z.'s preferred living arrangement, by all accounts, is on the streets of the City of Miami; but, when allowed to live there, C.Z. "decompensates." The cycle then repeats.

On these facts, the trial court took what was her only last shot at providing needed assistance to C.Z. She ordered the Department to create a placement for C.Z.:

> Therefore, this Court further ORDERS and ADJUDGES that DCF place [C.Z.] in a secure locked facility to provide for his daily needs such as; food, shelter, medication administration and personal hygiene and to prevent him from wondering (sic) and becoming a danger to

---

[2] The Department also has standing to bring such a petition, despite the fact that it was not a party to the criminal case or commitment proceeding. See Carmona, 159 So. 3d at 166.

7

himself and others. Further, the mental health professionals involved in this case should immediately begin to work together to find suitable options for future placement; [C.Z.] requires a facility that will redirect him when he tries to leave and a facility that has supervision. Further, he would benefit greatly from a smaller facility. [C.Z.], if left unsupervised, will inadvertently leave an unlocked or unsupervised facility which places him in harm's way. [C.Z.'s] chronic mental illness prevents him from making appropriate decisions to protect himself.

In so doing, the trial judge acknowledged the only possible authority to support her decision was section 916.17. This statute, entitled "Conditional release," reads in relevant part:

(1) Except for an inmate currently serving a prison sentence, the committing court may order a conditional release of any defendant **in lieu of an involuntary commitment to a facility pursuant to s. 916.13 or s. 916.15** based upon an approved plan for providing appropriate outpatient care and treatment….

(2) Upon the filing of an affidavit or statement under oath by any person that the defendant has failed to comply with the conditions of release, that the defendant's condition has deteriorated to the point that inpatient care is required, or that the release conditions should be modified, the court shall hold a hearing within 7 days after receipt of the affidavit or statement under oath. After the hearing, the court may modify the release conditions. **The court may also order that the defendant be returned to the department if it is found, after the appointment and report of experts, that the person meets the criteria for involuntary commitment under s. 916.13 or s. 916.15.**

(emphasis added). Unfortunately, the statute does not support the action taken by the trial court.

8

By its terms, subsection (1) of the statute authorizes an outpatient alternative to a locked involuntary commitment environment. The subsection expressly states that it is to be employed "in lieu of an involuntary commitment." "In lieu of" means "in place of." Bryan A. Garner, A Dictionary of Modern Legal Usage, 449 (2d ed. 1995). Here, "in lieu of" means in place of involuntary commitment. The provision carries out the intent of the Florida legislature expressed in section 916.105(3) that "evaluation and services to defendants who have mental illness . . . be provided in community settings, in community residential facilities, or in civil facilities, whenever feasible." In our view, this subsection does not and is not intended to create a separate statutory foundation for use by a trial court to order the Department to house and treat a mentally ill person who has been found non-restorable to competency to stand trial.

Nor does subsection (2) of the conditional release statute assist the court in upholding the commitment ordered in this case. This subsection first establishes that in the event a defendant has failed to comply with the conditions of his release, the conditions may be modified. Here, the court has found that there is no acceptable modification that is available. Subsection (2) then continues: "The court may also order that the defendant be returned to the [D]epartment if it is found, after the appointment and report of experts, that the person meets the criteria for involuntary commitment under s. 916.13 or s. 916.15." C.Z. meets

9

neither of these requirements. As we have noted already, C.Z. has been found to be non-restorable under section 916.13, and section 916.15 deals with defendants who have been adjudicated not guilty by reason of insanity. Thus, this subsection is likewise inapplicable in this case.

Counsel for C.Z. argues, nevertheless, that the Department is statutorily required to create "someplace for C.Z. to go." Counsel reminds us that even under medication, C.Z. is actively psychotic. He further points out the fact that, chiefly because C.Z. will not obtain the required medication or self-medicate while living on the streets, C.Z. deteriorates to a sub-human existence.[3] Counsel then makes the attractive argument that "The Florida legislature has charged the Department with the responsibility for 'the planning, evaluation, and implementation for <u>a complete and comprehensive statewide program of mental health</u>, including community services . . . ,' §394.457(2)(a), Fla. Stat. (2012)," and, further quoting, that "The department is responsible for . . . exercising supervision of mental health programs of, and the treatment of patients at community health facilities, other facilities, for persons who have a mental illness, and any agency or facility providing services to patients pursuant to this part." <u>Id.</u> However, counsel omits

---

[3]We do not believe counsel is overwrought in his advocacy on this point. For example, when C.Z. walked into the criminal courthouse unexpectedly on May 21, 2013, days after he had absconded from his residential placement, he was thin, unstable in gait, dirty, and hallucinatory to the point of having a large blowfly on his index finger, which he was petting as one would pet a dog or a cat.

the directive from the Legislature, found in the same sub-section, that the services shall be provided as "authorized and approved by the Legislature, based on the annual budget of the department." The Legislature has not established a mental health program or service for individuals in C.Z.'s situation. Counsel's cavil is therefore with the Legislature, not the Department.

The case before us is indistinguishable from <u>Carmona</u>, 159 So. 3d at 165. As in our case, the trial court found William Carmona incompetent to proceed to trial, and non-restorable. The trial court then ordered Mr. Carmona to be placed indefinitely in the custody of the Department pursuant to the conditional release provision of section 916.17(1), and that the Department assume the cost of the placement. The Second District Court of Appeal quashed the order of the circuit court, stating:

> [S]ection 916.13 sets the criteria that must be established before the trial court has the authority to involuntarily commit an individual for treatment. If an individual is found to have met these criteria and is thereby subject to being committed to the Department for treatment, section 916.17 provides an alternative to the residential commitment known as a "conditional release." In its April 20, 2014, order, the trial court specifically found that Mr. Carmona "does not meet the criteria for commitment to a treatment facility of the Department of Children and Families as provided in [section] 916.13." And "an incompetent defendant may not be committed to [the Department] if the statutory criteria are not met." <u>Amaya</u>, 10 So.3d at 156.

159 So. 3d at 167. In <u>Carmona</u>, as in this case, the statutory criteria were not met.

11

*Amaya*, 10 So. 3d at 152, cited by the Second District Court of Appeal in *Carmona*, is a similar case.  There, the defendant was arrested for forceful sexual battery of his 13-year-old stepdaughter.  The day after his arrest, he complained of weakness in his left side and continuous headache and was transported to the hospital.  He was diagnosed with an inoperable brain tumor and was advised he had approximately one year to live.  In further proceedings, Amaya was found not competent to proceed to trial, and that he was not likely to be restored to competency because of the advanced stage of his brain tumor.  The trial court ordered him to be conditionally released to the care and custody of the Department pursuant to section 916.17. The Fourth District Court of Appeal quashed the order.  As in *Carmona*, and as we decide today, that Court found that "Section 916.17 provides an alternative to placement in a treatment facility for defendants *committed* to DCF under section 916.13.  Contrary to the trial court's order, an incompetent defendant may not be committed to DCF if the statutory criteria [in section 916.13] are not met."  Id. at 155-56.

When a defendant is found non-restorable to competency and, therefore, does not meet the criteria for commitment, the next step is either to initiate civil commitment under the "Baker Act" or to release the defendant.  See, e.g., State v. Miranda 137 So. 3d 1133, 1135 (Fla. 3d DCA 2014) (citing Jackson v. Indiana 406 U.S. 715 (1972)); Dep't of Children & Family Servs. v. State & Barnett, 124 So.

12

3d 430, 433-34 (Fla. 2d DCA 2013) (citing <u>Amaya</u>, 10 So. 3d at 157). Florida Rule of Criminal Procedure 3.219(d) purports to create a short, safe harbor-like transition period before release, but only "for a period not to exceed 1 year." This time period had long expired by the time C.Z.'s final violation of his conditional release plan had occurred. The only lawful alternative available to the trial judge in this case was to release the defendant.

Context requires us to remind ourselves that any assertion the court lacked statutory authority for its action in this case must be analyzed with utmost care. The involuntary commitment statute of this state is a "massive curtailment of liberty." <u>Shuman v. State</u>, 358 So. 2d 1333, 1335 (Fla. 1978) (quoting <u>Humphrey v. Cady</u>, 405 U.S. 504, 509 (1972)). As the Florida Supreme Court recognized in <u>Pullen v. State</u>, 802 So. 2d 1113, 1117 (Fla. 2001), "an individual who faces involuntary commitment to a mental health facility has a liberty interest at stake." <u>See also</u> <u>State v. Goode</u>, 830 So. 2d 817 (Fla. 2002). "Those whom the State seeks to involuntarily commit to a mental institution are entitled to the protection of our Constitutions …." <u>Shuman</u>, 358 So. 2d at 1335; <u>see also</u> <u>Morel v. Wilkins</u>, 84 So. 3d 226 (Fla. 2012); <u>Mitchell v. State</u>, 911 So. 2d 1211 (Fla. 2005). The Florida Legislature recognizes as much in the preamble to Chapter 916. <u>See</u> §916.105(3), Fla. Stat. (2014) (stating that "It is the intent of the Legislature that treatment or training programs for defendants who are found to have mental illness . . . and are

involuntarily committed . . . be provided in a manner . . . which insures the rights of the defendants as provided in this chapter.").

In the instant case, the trial court used section 916.17 as its statutory authority to find a placement for C.Z. beginning in May 2011, when C.Z. was first found to be non-restorable to competency and no longer met the criteria for involuntary commitment under section 916.13. Under subsection (2), the trial court modified C.Z.'s release conditions on five different occasions for non-compliance. In an effort to find adequate placement, the trial court ordered the Department to "place [C.Z.] in a secure locked facility to provide for his daily needs … and to prevent him from wondering (sic) and becoming a danger to himself and others." To implement this directive, the trial court returned C.Z. to the custody of the Department. The order is no different in its effect on C.Z. than the original order of commitment issued under section 916.13(1) of the Florida Statutes, albeit with fewer safeguards.

Due to the statutory constraints, the trial court was faced with the difficult decision of either placing C.Z. in an unsecured community residential facility, against the advice of the evaluating psychologists, or releasing C.Z. out on the street. However, as was well stated in Barnett, 124 So. 3d at 433:

> While we certainly sympathize with the trial court's frustrations and unwillingness to contribute to potential chaos, we note that the rule of law simply does not permit a trial court to fashion its own remedy in derogation of statutory limitations, and good intentions cannot expand

14

the trial court's power in this regard. It is up to the legislature—not the trial court or this court—to close any gaps that may exist in the statutory scheme and to address the inadequacies of the existing law when applied to facts such as these.

We quash the order under review.

Petition granted, order quashed.