IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 14, 2025

## STATE OF TENNESSEE v. JOHNTAVIUS GRIGGS

**Appeal from the Criminal Court for Shelby County**
**No. 16-00307        Chris Craft, Judge**

_____

### No. W2023-01685-CCA-R9-CD
_____

In this interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9, we review the trial court's order denying the motion of Defendant, Johntavius Griggs, for release from custody after he was found to be incompetent to stand trial for first degree murder due to his intellectual disability. The trial court found that the conclusion of psychiatrists designated by the Department of Intellectual and Developmental Disabilities ("DIDD")[1] that Defendant was ineligible for involuntary commitment was based on their misinterpretation of the statutory provisions governing the involuntary commitment of defendants found to be incompetent to stand trial due to intellectual disability. The trial court ordered additional evaluations by DIDD-designated physicians or psychologists to determine Defendant's eligibility for involuntary commitment. Upon review, we conclude that the DIDD-designated psychiatrists misinterpreted the applicable statutory provisions in determining that Defendant did not meet the statutory requirements for involuntary commitment. Accordingly, we affirm the trial court's judgment denying Defendant's motion for release from custody, and we remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court Affirmed; Remanded**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Phyllis Aluko, District Public Defender; Harry E. Sayle, III (on appeal), and Jennifer Case and William E. Robilio (at hearings), Assistant Public Defenders, for the appellant, Johntavius Griggs.

---

[1] Effective July 1, 2024, DIDD was renamed the Department of Disability and Aging ("DDA"). *See* Tenn. Code Ann. § 4-3-2701 (Supp. 2024). We refer to the DIDD as it existed at the time of the hearings.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Karen Cook and Scott Bearup, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Facts and Procedural History

On January 14, 2016, Defendant was indicted on one count of premeditated first degree murder for a shooting that occurred on October 4, 2015, when Defendant was nineteen years old.  At the time of the offense, Defendant was released on bond for two charges of aggravated robbery.  The aggravated robbery offenses allegedly occurred on August 31, 2013, when Defendant was seventeen years old, and he was indicted on the aggravated robbery charges after the charges were transferred from juvenile court.  He has been in custody since October 8, 2015.

Following a forensic evaluation, Defendant filed a pleading on October 11, 2018, entitled "Motion for Review of Forensic Evaluation; To Release Defendant from Custody or Dismiss the Indictment."  Defendant alleged that he was not competent to proceed to trial due to his intellectual disability and that he was not likely to become competent.  The State subsequently filed a motion for involuntary commitment.[2]

The record reflects that Defendant has undergone numerous evaluations and that multiple hearings have been held regarding Defendant's competency to stand trial and his committability.  Based on the testimony of the mental health experts who evaluated Defendant, the trial court found that Defendant is not competent to stand trial due to his intellectual disability and likely will never be competent to stand trial.  On appeal, the parties do not challenge the trial court's findings as to Defendant's competency to stand trial.  Rather, the issue on appeal involves whether Defendant meets the statutory criteria for involuntary commitment.  *See* Tenn. Code Ann. §§ 33-5-403 (repealed effective July 1, 2024); 52-5-404(a) (Supp. 2024).

Evidence presented during various hearings and the trial court's orders reflect that Defendant's prior criminal history includes a charge of aggravated rape of a child at age eleven, which was dismissed in juvenile court due to Defendant's incompetency to stand trial; an aggravated burglary charge obtained while the aggravated rape of a child charge

---

[2] During a subsequent hearing, the State indicated that the motion was filed on October 16, 2018, but the motion is not included in the appellate record.

- 2 -

was pending that was also dismissed due to Defendant's incompetency; charges of possession of a controlled substance with the intent to sell and theft of property valued over $1,000 at age thirteen; a sexual battery charge at the age of fourteen; two separate assault charges at the age of fifteen; the two indicted charges of aggravated robbery at the age of seventeen; and the indicted charge of first degree premeditated murder at the age of nineteen.

During the October 17, 2018 hearing, two psychologists testified regarding Defendant's eligibility for involuntary commitment, Dr. John Stephen Bell, who was the Director of the Behavioral Health Unit at the West Regional Office of DIDD, and Dr. Wyatt Nichols with West Tennessee Forensic Services. Dr. Bell testified that he evaluated Defendant, whose I.Q. score was "in the 50's," and concluded that Defendant was not competent to stand trial due to his intellectual disability and was not likely to become competent absent his participation in an intensive in-patient program. Dr. Bell stated that Defendant would likely benefit from care, training, and treatment, and Dr. Bell was unaware of any other less drastic alternatives to judicial commitment. Dr. Bell determined that Defendant did not qualify for commitment because he did not pose a substantial likelihood of serious harm. Dr. Bell considered Defendant's condition as it existed at the time in which he met with Defendant, and Dr. Bell testified that during the meetings, Defendant did not express homicidal, suicidal, or violent thoughts or threats or display any active hallucinations or delusions. Dr. Bell stated that he did not consider Defendant's history of violent behavior and that he believed such behavior to be irrelevant based on his training and his interpretation of the statutory provisions.

Dr. Nichols testified that he evaluated Defendant on multiple occasions through the years, with the most recent occurring in November 2017 after Defendant was charged with aggravated robbery. Dr. Nichols disagreed with Dr. Bell's opinion that Defendant's history of violent behavior should not be considered in determining his committability, and Dr. Nichols testified that due to Defendant's intellectual disability and history of violent behavior, "[h]e would be a danger if he were released to the street today." Dr. Nichols noted that another psychologist, Dr. Lynne Zager, likewise concluded that Defendant met the statutory criteria for involuntary commitment, but neither Dr. Nichols nor Dr. Zager were designated by the DIDD as a psychologist authorized to sign a certificate of need for commitment.

Defendant also presented evidence that due in part to his prior criminal history, he had been denied services with a community-based program for those with intellectual disabilities and admission into a structured rehabilitation program administered by the DIDD and designed to help those with intellectual disabilities be "successful in community living."

At the conclusion of the hearing, the trial court determined that Defendant met the criteria for involuntary commitment, finding that Defendant was intellectually disabled, that he needed care, training, or treatment, and that less drastic alternatives to judicial commitment were not suitable. The court also found that Defendant posed a substantial likelihood of serious harm as defined by statute and that Dr. Bell's interpretation of the provision was "unrealistic." *See* Tenn. Code Ann. §§ 33-6-501; 55-5-402 (Supp. 2024). Thus, the court granted the State's petition for involuntary commitment. However, the court later issued a written order finding that Defendant could not be committed because Dr. Bell, as the only DIDD-designated psychologist who evaluated Defendant, did not sign a certificate of need for commitment. *See* Tenn. Code Ann. §§ 33-5-404 (repealed effective July 1, 2024); 52-5-405 (Supp. 2024) (requiring two certificates of need by licensed physicians or psychologists designed as health services providers by the DIDD (now DDA)). The court ordered that Defendant be remanded to the custody of the DIDD for ninety days in part to determine whether Defendant met the criteria for involuntary commitment or otherwise qualified for any community-based alternatives to judicial commitment.

Defendant was transferred to DIDD custody at the Harold Johnson Center ("HJC") in January 2019 and was not discharged until September 2019. On July 6, 2021, Defendant filed a motion requesting that he be released from custody. He argued that upon his discharge from the HJC in September 2019, Dr. Anna Settle, a psychologist, wrote a letter opining that Defendant was competent, that Dr. Settle had since stated that she would be unable to testify regarding Defendant's present level of competency, and that the HJC declined to readmit Defendant.

During a hearing on November 23, 2021, Debbie Nichols, a forensic social worker with West Tennessee Forensic Services, testified that she evaluated Defendant on numerous occasions over the years, that she consistently found that Defendant was not competent, and that Defendant would benefit from commitment, explaining that "his progression of offenses from the less violent to the most violent in a span of a few years indicates that he needs somebody to monitor and care for him closely." Dr. Nichols, who evaluated Defendant again in October 2021, also testified that Defendant was not competent, was not likely to become competent, would be unable to function in society if released, and would tend "to gravitate to negative peer groups."

On December 21, 2021, the trial court issued an order finding that Defendant met the criteria for involuntary commitment and denying his motion to be released. The court found that Defendant posed a "substantial likelihood of serious harm," that Dr. Bell's testimony was not credible, and that Dr. Bell's "ignoring the [D]efendant's past actions was extremely reckless and unprofessional, which would lead to an unjust result." The court stated that it had hoped that the DIDD would reconsider commitment following the

- 4 -

first hearing but that the DIDD "just gave [Defendant] competency training and then released him back to the Shelby County Jail." The court found that the DIDD violated Defendant's due process rights by designating Dr. Bell as the only psychologist with the authority to sign a certificate of need. The court noted that under *Jackson v. Indiana*, 406 U.S. 715 (1972), the court could not order that Defendant remain in the Shelby County Jail "in perpetuity" but that the court also could not release Defendant because he posed a "substantial likelihood of serious harm" to himself or others if released. The court ordered that Defendant be remanded to the HJC for further evaluation by "a different, qualified expert."

In January 2022, Defendant filed a motion for an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9. The trial court entered an order granting the motion and stating that the issue certified for appellate review was "Whether continued detention without trial, where Defendant is intellectually disabled, is not competent to stand trial, never will be competent, but is technically committable, violates Defendant's constitutional right to due process of law[.]" Defendant filed a Rule 9 application in this court, and on March 30, 2022, this court entered an order denying Defendant's application for an interlocutory appeal. *See State v. Griggs*, No. W2022-00111-CCA-R9-CD (Tenn. Crim. App. Mar. 30, 2022) (order). This court noted that Defendant only challenged the trial court's decision to not release him and that Defendant did not assert that the trial court acted unreasonably by remanding him for further evaluation or that this court otherwise had jurisdiction to review the interpretation of the relevant statutes by Dr. Bell or the DIDD. *Id.*

Defendant filed an application for permission to appeal to the Tennessee Supreme Court, and our supreme court entered an order denying Defendant's application on October 24, 2022. *See State v. Griggs*, No. W2022-00111-SC-R11-CD (Tenn. Oct. 24, 2022) (order). Our supreme court noted that the State acknowledged that Dr. Bell misinterpreted the statutory provisions setting forth the definition of "substantial likelihood of serious harm" and that Defendant was being evaluated a second time by the DIDD based on the trial court's orders. *Id.* Our supreme court continued, "We assume (1) any evaluations will be performed in accordance with the interpretation of [the statutory provision] the State indicates is correct in its response to the defendant's application; and (2) that there will be at least two such evaluations, pursuant to [statute]." *Id.* "Based on these assumptions," our supreme court found that "it would not be prudent to grant permission to appeal at this time." *Id.*

In a letter dated February 16, 2023, Dr. Michael Loftin, a psychologist who is contracted with the DIDD to conduct forensic evaluations, stated that he evaluated Defendant and concluded that Defendant did not meet with criteria for involuntary commitment because he did not pose "a substantial likelihood of serious harm." Dr. Loftin

listed the offenses with which Defendant was charged as "robbery and attempted first degree murder" and stated that "[t]he facts of what [Defendant] may or may not have done in the commission of the crimes which he is accused of having committed are neither well established nor agreed upon from a psychologist's perspective for the purposes of predicting future behavior." Dr. Loftin stated that he reviewed the records provided to him and interviewed Defendant, who denied committing the offenses. Dr. Loftin opined that "I may not use alleged crimes, which the individual has not been convicted of, denies committing, and for which I have seen no further evidence of, as a basis to involuntarily commit this individual because of his intellectual disability." Dr. Loftin noted that the criminal offenses were more remote in time and, therefore, "less relevant" in determining whether Defendant "presently meets the criteria for the commitment statute because only present potential for harm is estimated by a psychologist." Dr. Loftin concluded, "There is insufficient information to determine that, based on his intellectual disorder, there is currently a substantial likelihood of [Defendant] harming himself or harming another person or that he is unable to in a setting that is less restrictive than the secure unit at the [HJC] in Nashville."

On March 20, 2023, Defendant filed a second motion seeking release from custody on his own recognizance. He relied on Dr. Loftin's report and argued that he was not competent to stand trial, that he was never going to be competent to stand trial, and that the DIDD concluded that he did not meet the criteria for involuntary commitment. Defendant maintained that his continued confinement in jail violated his due process rights.

During an evidentiary hearing on May 11, 2023, Dr. Loftin testified that in evaluating Defendant, he reviewed Defendant's jail records and the records from his time at HJC in 2018 and 2019. Dr. Loftin also interviewed Defendant at the Shelby County Jail. Dr. Loftin stated that his evaluation was in response to the trial court's order issued in 2021, that he had not reviewed the order from the Tennessee Supreme Court, and that he was unsure whether he would have understood the Tennessee Supreme Court's order because he was not an attorney. Based on his evaluation, he concluded that Defendant did not pose a substantial likelihood of serious harm because of his intellectual disability and, therefore, did not meet the criteria for commitment in the HJC.

Dr. Loftin testified that Defendant's prior criminal history and charges did not cause him any concern as they related to Defendant's committability. Dr. Loftin stated that during his interview, Defendant denied committing the offenses for which he was charged or wanting to kill or otherwise harm anyone inside or outside of the jail. Dr. Loftin did not review any of the allegations in detail with Defendant once Defendant denied committing the charges; Dr. Loftin did not request any discovery from the State related to the charges; he did not recall receiving any records from West Tennessee Forensic Services; and he did not question Defendant regarding the environment in which he lived prior to and at the

time of the offenses. Dr. Loftin did not review statements of witnesses identifying Defendant as the person who shot and killed the murder victim or Defendant's statement to law enforcement in which he admitting shooting the murder victim in the back of his head. He also did not review Defendant's "juvenile information."

Dr. Loftin noted that the offenses for which Defendant was charged occurred almost seven years prior to the hearing and that the records from the jail and the HJC showed that Defendant had not engaged in violent behavior while in custody. Dr. Loftin stated that in reviewing the records, he searched for "indicators" that Defendant "is someone who because of his intellectual disability is prone to violence . . . toward himself or other people based on his track record over the last several years." Dr. Loftin agreed that Defendant was in a controlled environment while incarcerated and that "the mean streets of Memphis" was a different environment than jail. However, he stated that an intellectually disabled person who tends to become violent in response to a stressful situation "would probably be exhibiting these behaviors consistently over time and would not be able to control them alone." Dr. Loftin was unsure whether the fact that Defendant was evaluated while in a different environment from the environment in which he lived at the time of the criminal offenses was relevant to the evaluation. Dr. Loftin noted that many people housed at HJC are "very violent all the time" and that Defendant did not "show a track record of that as many others do in jail . . . and the [HJC] over several years."

Dr. Loftin stated that in determining Defendant's eligibility for commitment, he was limited under the applicable statutory provisions "to what is caused or greatly influenced by the intellectual disability and not other types of mental problems." Dr. Loftin did not evaluate Defendant to determine whether he had any mental health disorders. He concluded that Defendant did not "currently" pose a threat to himself or others "based on his intellectual disability."

Dr. Loftin agreed that Defendant needed care, training, or treatment due to his intellectual disability. Dr. Loftin acknowledged that he was unaware of the environment in which Defendant would be placed if he "returned to the streets" and that Defendant needed support for financial decisions, transportation, food, and healthcare decisions. Dr. Loftin testified that less drastic alternatives to commitment were "[p]otentially available" to meet Defendant's needs, but he subsequently acknowledged that he was unaware of any less drastic alternatives that were available at the time of the hearing. He said that "[i]n the way that I stated that in the letter," jail was a less drastic alternative to the twenty-four-hour supervision and services at the HJC. Dr. Loftin testified that to conclude that Defendant met the criteria for commitment, he would have to find that there was no other location in the State other than the locked unit of the HJC where Defendant could be sufficiently housed without increased risk of harm to himself of others and that "I can't say that." Dr. Loftin stated that Defendant "has shown he can live in other environments short

of that intellectual facility and do okay." However, Dr. Loftin acknowledged that jail was "more restrictive" as it provided for less freedom of movement and activity than the HJC.

On October 10, 2023, the trial court entered a detailed order denying Defendant's motion for release. The court disagreed with Dr. Loftin's failing to consider and discounting Defendant's prior criminal history and the allegations in this case. The court also disagreed with Dr. Loftin's interpretations of the statutory provisions as requiring that Defendant be found dangerous "because of his intellectual disability" to be committable. Recognizing that the court could not order Defendant be involuntarily committed because two DIDD-designated psychiatrists had not issued certificates of need, the court ordered the DIDD to conduct further evaluations of Defendant to determine his eligibility for involuntary commitment.

On November 6, 2023, Defendant filed a second motion for an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9, and the trial court granted the motion. The trial court certified the following issues for review:

> [1]    Whether continued detention without trial, where Defendant is intellectually disabled is not competent to stand trial, never will become competent, but is technically not committable, violates Defendant's constitutional right to due process of law guaranteed by the 5th and 14th Amendments to the Constitution of the United States and art. 1, § 8 of the Tennessee Constitution; and

> [2]  Whether the Department of Intellectual and Developmental Disabilities' ("DIDD") examining physicians misinterpreted Tennessee Code Annotated § 33-6-501.

Defendant filed an application for an interlocutory appeal in this court, and on March 7, 2024, this court entered an order granting Defendant's application regarding the second issued certified by the trial court: "Whether the DIDD-designated psychologists have properly interpreted Tennessee Code Annotated § 33-6-501 and other relevant statutes." *See State v. Griggs*, No. W2023-01685-CCA-R9-CD (Tenn. Crim. App. Mar. 7, 2024) (order).

This opinion follows.

## II.  Analysis

The issue presented for review concerns statutory construction, which is a question of law that we review de novo with no presumption of correctness. *See State v. Robinson*,

676 S.W.3d 580, 584 (Tenn. 2023); *State v. Jones*, 589 S.W.3d 747, 756 (Tenn. 2019). "'The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Robinson*, 676 S.W.3d at 584 (quoting *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016); *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). In doing so, we begin with the plain language of the statute. *State v. Frazier*, 558 S.W.3d 145, 152 (Tenn. 2018) (citing *Spires v. Simpson*, 539 S.W.3d 134, 143 (Tenn. 2017)). "'When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use.'" *Id.* (quoting *State v. Hannah*, 259 S.W.3d 716, 721 (Tenn. 2008); *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004)).

In construing a statute, courts must "give the words of a statute their 'natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose.'" *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022) (quoting *Ellithorpe v. Weismark*, 479 S.W.3d 818, 827 (Tenn. 2015)). Courts also should "consider the whole text of a statute and interpret each word 'so that no part will be inoperative, superfluous, void or insignificant.'" *Id.* (quoting *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 228 (Tenn. 2010)). Other traditional tools of statutory construction include the consultation of dictionary definitions and the examination of statutory structure and context. *Id.* at 930. Courts must examine "the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *Spires*, 539 S.W.3d at 143 (quoting *State v. Collins*, 166 S.W.3d 721, 726 (Tenn. 2005)). Courts must seek a reasonable interpretation of the statute "'in light of the purposes, objectives, and spirit of the statute based on good sound reasoning.'" *Beard v. Branson*, 528 S.W.3d 487, 496 (Tenn. 2017) (quoting *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 286 (Tenn. 2001)). "[W]hen the plain meaning of a statute is clear after application of the traditional tools of statutory interpretation, a court should not delve into the legislative history of an unambiguous statute." *Deberry*, 651 S.W.3d at 930 (citations omitted).

The procedure for commitment of a criminal defendant found to be incompetent to stand trial due to an intellectual disability is provided by statute. Under such circumstances, "the district attorney general may file a complaint to require involuntary care and treatment of the defendant" to be heard by the trial court before which the defendant's criminal case is pending. Tenn. Code Ann. §§ 33-5-402(2), (3) (repealed effective July 1, 2024); 52-5-403 (Supp. 2024). A defendant may be judicially committed to involuntary care and treatment in the custody of the DIDD (now DDA) if (1) the defendant is intellectually disabled; (2) the defendant "poses a substantial likelihood of serious harm . . . because of the intellectual disability"; (3) the defendant "needs care, training, or treatment because of the intellectual disability"; (4) "all available less drastic alternatives to judicial commitment are unsuitable to meet the needs of the person"; and

(5) "the district attorney general files a complaint to require involuntary care and treatment[.]" Tenn. Code Ann. §§ 33-5-403 (repealed effective July 1, 2024); 52-5-404(a) (Supp. 2024).  Furthermore, a defendant may not be judicially committed unless licensed physicians or psychologists designated by the DIDD (now DDA) file "two (2) certificates of need for training and treatment certifying that the defendant satisfies the requirements of [involuntary commitment in subsections] (1)-(14) and showing the factual foundation for the conclusions on each item."  Tenn. Code Ann. §§ 33-5-404 (repealed effective July 1, 2024); 52-5-405 (Supp. 2024).

> A person poses a "substantial likelihood of serious harm" if
>
> (1)(A)  a person has threatened or attempted suicide or to inflict serious bodily harm on the person, OR
> (B)  the person has threatened or attempted homicide or other violent behavior, OR
> (C)  the person has placed others in reasonable fear of violent behavior and serious physical harm to them, OR
> (D)  the person is unable to avoid severe impairment or injury from specific risks, AND
> (2)  there is a substantial likelihood that the harm will occur unless the person is placed under involuntary treatment.

Tenn. Code Ann. § 33-6-501; *see* Tenn. Code Ann. § 55-5-402 (Supp. 2024).  Effective July 1, 2024, the statutes governing judicial commitment were repealed and redesignated to other code sections, retaining most of the language from the prior statutes.  *See* Tenn. Code Ann. §§ 52-5-402—405 (Supp. 2024).  Our legislature also amended the statutes to include "a rebuttable presumption that a person meets the standards in subdivisions (a)(1)-(4) [of Code section 52-5-404] for judicial commitment if the person was charged with a felony or Class A misdemeanor and found by a court to be incompetent to stand trial for the offense due to an intellectual disability[.]"  Tenn. Code Ann. § 52-5-404(b)(1) (Supp. 2024).  This presumption "may only be rebutted by clear and convincing evidence that the person does not pose a substantial likelihood of serious harm."  Tenn. Code Ann. § 52-5-404(b)(2) (Supp. 2024).

On appeal, both Defendant and the State assert that Dr. Bell and Dr. Loftin erred in failing to consider Defendant's prior criminal history and current charges in concluding that he did not pose a substantial likelihood of serious harm.  The State also asserts that Dr. Loftin erred in relying upon Defendant's continued confinement in jail in determining that less drastic alternatives to judicial commitment were available to Defendant.  Defendant requests that this court either release him on his own recognizance or order that he be committed.  The State requests that this court remand the matter for evaluations by two

DIDD-designated psychiatrists or psychologists and instruct them to consider all of Defendant's "prior history of violence and how it interacts with his intellectual disability."

The statutory amendment regarding the rebuttable presumption in Code section 52-5-404(b) went into effect during the course of the parties' briefing, and this court entered an order requesting supplemental briefing to address the effect, if any, of the amendment to the issue presented on appeal. Both parties filed supplemental briefs in which they agreed that the amendment is procedural in nature and does not implicate *ex post facto* issues that would prohibit retroactive application. Defendant urges this court to apply the presumption on appeal and that "[s]hould the burden of presumption be overcome, then due process dictates that the case should be dismissed." The State, however, maintains that this court should not apply the rebuttable presumption on appeal because Defendant has not had the opportunity to present evidence in an effort to rebut the presumption for judicial commitment. The State urges this court to remand with instruction for the designated psychologists to consider Defendant's criminal history and current charges in determining whether to issue certificates of need for his involuntary care and treatment after which the trial court may hold a hearing and consider the rebuttable presumption that Defendant meets the criteria for judicial commitment and any evidence presented by Defendant to rebut the presumption.

## A. Failure to Consider Defendant's Criminal History and Pending Charges

The trial court concluded that Dr. Bell and Dr. Loftin erred in failing to consider Defendant's prior criminal history and pending charges in determining that Defendant did not pose "a substantial likelihood of serious harm . . . because of the intellectual disability." *See* Tenn. Code Ann. §§ 33-5-403(2) (repealed effective July 1, 2024); 52-5-404(a)(2) (Supp. 2024). Both Defendant and the State also assert that Dr. Bell and Dr. Loftin misinterpreted the applicable statutory provisions. We agree.

The statutory definition of "substantial likelihood of serious harm" requires a determination of whether the defendant (A) "has threatened or attempted suicide or to inflict serious bodily harm on the person," (B) "has threatened or attempted homicide or other violent behavior," (C) "has placed others in reasonable fear of violent behavior and serious physical harm to them," or (D) "is unable to avoid severe impairment or injury from specific risks[.]" Tenn. Code Ann. § 33-6-501(1)(A)-(D); *see* Tenn. Code Ann. § 52-5-402(1)(A)-(D) (Supp. 2024). The statutory definition then requires a determination of whether "there is a substantial likelihood that the harm will occur unless the person is placed under involuntary treatment." Tenn. Code Ann. § 33-6-501(2); *see* Tenn. Code Ann. § 52-5-402(2) (Supp. 2024). Thus, the statute requires consideration of a defendant's violent conduct or threats of such conduct under subsections (1)(A) through (C) to determine whether there is a substantial likelihood that harm will occur unless the

defendant is not placed under involuntary treatment. Neither the statutory definition of "substantial likelihood of serious harm" nor the statutory requirements for involuntary commitment place temporal limitations on the violent conduct by the defendant to be considered. *See* Tenn. Code Ann. §§ 33-5-403 (repealed effective July 1, 2024); 33-6-501; 52-5-402 (Supp. 2024); 52-5-404(a) (Supp. 2024).

Furthermore, the plain language of the statute also establishes that a defendant's prior violent history and underlying charges should be considered in determining whether a defendant poses "substantial likelihood of serious harm." Our supreme court has recognized the "importance of verb tense in a phrase" when interpreting a statute, although the words must be read in the context of the statute as a whole. *Amos v. Metro. Gov't of Nashville & Davidson Co.*, 259 S.W.3d 705, 713 (Tenn. 2008) (citing *Baker v. Donegan*, 52 S.W.2d 152, 153 (Tenn. 1932)); *see Nationwide Mut. Fire Ins. Co. v. Memphis Light, Gas & Water*, 578 S.W.3d 26, 35 (Tenn. Ct. App. 2018) ("[I]n construing statutes, we must consider the grammar employed by the legislature."). The terms "has placed" and "has threatened" in subsections (1)(A) through (C) are in present perfect tense, which "'indicates that the legislature intended for the court to consider conduct that occurred in the past up to and including the present.'" *In re Angelleigh R.*, No. M2020-00504-COA-R3-JV, 2021 WL 1994033, at *19 (Tenn. Ct. App. May 19, 2021) (quoting *In re Sheneal W. Jr.*, 728 A.2d 544, 550 (Conn. Super. Ct. 1999); *see The Chicago Manual of Style* § 5.132 (17th ed. 2017) (noting that the use of "has with the principal verb's past participle" is the present perfect tense and using "has drunk" as an example). Thus, the phrasing in subsection (1)(A) through (C) requiring consideration of whether the defendant "has placed" or "has threatened or attempted" the violent conduct indicates the legislature's intention that a defendant's prior violent history be considered in determining whether the defendant poses a "substantial likelihood of serious harm." *See* Tenn. Code Ann. § 33-6-501(1)(A)-(C); 52-5-402(1)(A)-(C) (Supp. 2024). This interpretation is consistent with the stated purpose of Code sections 33-6-501 and 52-5-402 in examining the likelihood that a defendant will cause serious harm to himself or others unless placed under involuntary treatment.

Finally, the recent amendment to Code section 52-5-404(b)(1) (Supp. 2024) also clearly establishes the legislature's intention that a defendant's pending charges for which he had been found incompetent to stand trial be considered in determining whether the defendant should be involuntarily committed. According to this amendment, a defendant's felony or Class A misdemeanor charges are so important to the issue of involuntary commitment that there is a rebuttable presumption that a defendant meets the standards for judicial commitment if charged with such offenses and found to be incompetent to stand trial for the offenses due to an intellectual disability. *See* Tenn. Code Ann. § 52-5-404(b)(1) (Supp. 2024).

We conclude that the plain language of the statutes requires consideration of a defendant's prior violent conduct, including his pending charges, in determining whether a defendant who has been found incompetent to stand trial due to an intellectual disability poses a "substantial likelihood of serious harm" as a requirement for involuntary commitment. Accordingly, Dr. Bell and Dr. Loftin erred in failing to consider Defendant's prior violent history, including his pending charges, in concluding that Defendant did not meet the requirements for involuntary commitment.

## B. Consideration of Jail as a Less Drastic Alternative to Commitment

The State asserts that Dr. Loftin erred in considering confinement in jail as a less drastic alternative than judicial commitment. Dr. Loftin offered conflicting testimony regarding whether "all available less drastic alternatives to judicial commitment are unsuitable to meet the needs of the person." Tenn. Code Ann. §§ 33-5-403 (repealed effective July 1, 2024); 52-5-404(a)(4) (Supp. 2024). Although Dr. Loftin testified that he was unaware of any available less drastic alternatives to judicial commitment, he also appeared to rely on Defendant's confinement in jail as an available less drastic alternative to judicial commitment. However, the United States Supreme Court has held that an incompetent defendant cannot be detained in jail indefinitely. *See Jackson v. Indiana*, 406 U.S. 715, 738-39 (1972). Accordingly, Dr. Loftin erred in relying upon Defendant's continued detention in jail as a less drastic alternative to judicial commitment.

## C. Remand

Defendant concedes, and the State agrees, that the amendment to Tennessee Code Annotated section 52-5-404(b) (Supp. 2024), creating a rebuttal presumption that a defendant meets the standards for judicial commitment if the defendant is charged with a felony or Class A misdemeanor and found to be incompetent to stand trial due to an intellectual disability and providing that the presumption may only be rebutted by clear and convincing evidence that the defendant does not pose a substantial likelihood of serious harm, is procedural and does not implicate *ex post facto* issues that would prohibit retroactive application. The State contends that this court's application of the rebuttable presumption in Code section 52-5-404(b) for the first time on appeal "would recreate an unjust result." *See State v. Thomas*, 687 S.W.3d 223, 245 (Tenn. 2024) (abolishing the requirement of corroboration of accomplice testimony but declining to apply the change in the law to the defendant's appeal due to "the interest of fairness"). The State notes that because the amendment to the statute did not go into effect until after the evidentiary hearing, Defendant has not yet had the opportunity to attempt to present evidence to rebut the presumption.

Defendant argues that this court should apply the rebuttable presumption to the proof presented during the prior hearings, but Defendant does not include any argument in his supplemental brief that the evidence presented during the prior hearings was sufficient to rebut the presumption set forth in Code section 52-5-404(b) (Supp. 2024). Rather, Defendant seeks dismissal of the charges or release on his own recognizance pending further proceedings based on his claim that his continued confinement violates his due process rights. We note that in his application for an interlocutory appeal filed in this court, Defendant sought to present a claim that his continued confinement violated his due process rights, and this court declined to grant review of the issue. *See State v. Griggs*, No. W2023-01685-CCA-R3-CD (Tenn. Crim. App. Mar. 7, 2024) (order). Thus, we decline to address the issue. *See State v. Bristol*, 654 S.W.3d 917, 923 (Tenn. 2022) (noting that this court has "limited discretionary authority to review unpreserved and unpresented issues").

This case is in a unique posture. Both Defendant and the State agree that Dr. Bell and Dr. Loftin misinterpreted the statutory requirements for involuntary commitment, and we reach the same conclusion. Defendant asserts that this court should apply the amended provisions of Code section 52-5-404(b) (Supp. 2024) on appeal but makes no argument that the proof rebuts the presumption or that the requirements of involuntary commitment in subsections (1) through (5) otherwise have not been met. However, as recognized by the trial court, this court and the trial court cannot order that Defendant be involuntarily committed at this juncture due to the absence of two certificates of need by licensed physicians or psychologists designated by the DIDD (now DDA). *See* Tenn. Code Ann. §§ 33-5-404 (repealed effective July 1, 2024); 52-5-405 (Supp. 2024).

Accordingly, we agree with the trial court that the appropriate remedy is to order additional evaluations of Defendant by physicians or psychologists designated by DDA to determine whether to issue certificates of need certifying that Defendant meets the requirements of involuntary commitment. We note that our supreme court previously declined to grant Defendant's application for permission to appeal the trial court's prior order for additional evaluations following Dr. Bell's misinterpretation of the applicable statutory provisions based upon "assumptions" that "(1) any evaluations will be performed in accordance with the interpretation of [the statutory provision] the State indicates is correct in its response to the defendant's application; and (2) that there will be at least two such evaluations, pursuant to [statute]." *State v. Griggs*, No. W2022-00111-SC-R11-CD (Tenn. Oct. 24, 2022) (order). However, when Dr. Loftin evaluated Defendant, he failed to consider Defendant's prior violent history and current criminal charges, and the DIDD (now DDA) failed to conduct two evaluations. Therefore, on remand, the DDA shall conduct at least two evaluations of Defendant during which the DDA-designated physicians or psychologists shall consider the statutory provisions as construed in this opinion. Following the evaluations, the trial court shall conduct an evidentiary hearing to

determine whether Defendant should be involuntary committed during which Defendant will be granted the opportunity to present evidence in an effort to rebut the presumption that he meets the requirements for involuntary commitment as provided in Code section 52-5-404(b).

## III.  Conclusion

We affirm the trial court's judgment denying Defendant's motion for release from custody, and we remand the matter for additional evaluations of Defendant and for further proceedings consistent with this opinion.

_____
s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE
